Before you sort of launch into a lengthy argument, we're very much aware of what's happening at the Supreme Court. We sort of follow what they're up to, and I'm sure you do. They have a case right now where they just had an argument not too long ago in Stoner Ridge v. Scientific Atlanta, which seems to might address one of the issues that is, in this case, scheme fraud. Good morning, Your Honor. Solomon Serafin, lead plaintiff of the Loran Group. Your Honor, you're correct. It may address that issue. That's one of a few issues that we've raised on appeal. Right. Yeah. Let me just say it might be – we might want to wait before we actually resolve the case until we see what the Supreme Court says. I'd like to suggest another approach, if I might. What's that? Respectfully, Your Honor, well, I think there's two distinct aspects to this case. There are the allegations against the KPMG and Mr. Rada, which deal with a third-party vendor and whether they can be held liable for conduct. That's scheme liability, squarely. Yes. The question is, do we partition this case, so to speak, and decide the outside directors and those that just deal with Sienta and then later on chime in on scheme liability? You know, I think as to – I think they're separable. I think the director case is separable from the KPMG case. I think you can do that. I would suggest under existing Ninth Circuit law, the Simpson case, we think we win on the KPMG defendants at this point. I agree. We don't dispute. There's a case coming down. It's going to be issued shortly. It's probably going to bear some way on this. We don't know for sure. We don't know what the vote will be. It could be a tie vote. There were only eight justices sitting, so we don't really know how it's going to come down. I don't think that that case is as relevant for the claims against the directors as it is for the claims against KPMG, because the factual scenario that was addressed in Stonebridge is almost foursquare with the facts here as to KPMG, except in our case we have a guilty plea from an officer of KPMG related to his conduct concerning Peregrine. They didn't have anything like that in the Stonebridge case, but we have that here, a guilty plea to conspiracy to commit securities fraud and other violations. So that distinguishes it. And under existing Ninth Circuit law, we win. I'm not opposed to waiting for that decision as it relates to KPMG, but I think on these other directors and some of the officers, we can launch right in and get that result. All right. Why don't you focus primarily on that? I will do that, Your Honor. Thank you. First, I just want to point out that unlike, I think, the distinguishing characteristic of this case from the two other securities cases you heard earlier today is that we have a massive restatement. We've got numerous guilty pleas, including from the chief executive officer of Peregrine. We've got numerous pending indictments of various individuals that were involved in what has been an admitted accounting fraud. The issue for us here is can we hold the directors of this company and certain of the officers liable for making false statements regarding the company's financial performance? That is the issue. Now, what do we have to show for that? We have to show either they knew or recklessly disregarded facts that rendered the public statements issued by this company, many of which were signed by the directors, false and misleading. That is the standard. We submit, the district court here, set an impermissibly high, indeed, an impossible standard for a securities plaintiff to meet. In this case we've got to show that. But what exactly did the district court say that was incorrect? Or what was wrong with the standard the district court applied? What was wrong, Your Honor, was that he did not, under America West and authorities which are supported by TLABS, look at the allegations holistically. He parsed each and every allegation, including each internal document that we showed the defendants had access to that we claimed gave them material adverse information that was contrary to what they were saying in their public statements. He went through each line in each of those documents and said, well, you're right, here's some negative information. But you know what? A couple of paragraphs down here, there's some positive information which counteracts that. So I'm not going to find that that gave them knowledge of material adverse information. That's an example of the type of parsing in excruciating detail that is exactly not to be done, according to Justice Ginsburg's opinion, in TLABS. And the product of that was the court essentially is almost acting like a jury when it does that. I mean, those are really typically questions, they're credibility issues, they're how much weight do we give to particular statements. That is something that is more appropriately left for the jury, or at least to summary judgment. We're talking here about pleading a claim for relief. And TLABS, one thing that hasn't been mentioned I think is worth mentioning about TLABS, everything that's been said, you know, that you don't need a smoking gun, and if it's a tie, it goes to the plaintiffs, that's all true, and that's all relatively new. But TLABS continues to say that the facts pled by the plaintiff are to be assumed to be true. That's like 12b. 12b. And it reiterates that. You assume all the facts are true. Exactly. But they do tell us you've got to take into account any, you know, negative, the positive inferences that support the defense. What specifically it says is you have to, a court must consider plausible non-culpable explanations for the defendant's conduct. Plausible. That's, I think, a key consideration here. And, again, if the allegations taken as true are equally as plausible that there were knowing or reckless misstatements, the plaintiff wins. It's a 12b. 6 motion. We are not talking about imposing liability. We're talking about a chance to get discovery in one of the, what was called the biggest fraud in the history of the Southern District of California. And the court's approach denied us even discovery as to people who were responsible for running the company that were on the board of directors, Your Honor. And I think that is just, it's too high a hurdle in a case like this, a massive restatement, a criminal case. It's just too high of a hurdle that was established. And I'd like to just talk a little bit about some of the facts that have been pled in huge detail. Now, I want the court to recall. As I recall, it was a 400-page complaint. With appendices. I think that's correct. And, Your Honor, we felt we needed to do that because we did get a prior order from Judge Jones in the Southern District of California, which addressed in some detail what was in our original complaint. And he gave us a road map. And it was a demanding road map because the standard in the Ninth Circuit has been demanding and is demanding. And we understand that. We tried our best to follow the road map. And in connection with our activities, we were able to gain access to some of Peregrine's records through their bankruptcy proceeding. And we incorporated the information that we got from that, including ongoing investigations that were going on by the company into potential claims against its directors and the like. We put that in the complaint as best we could with the information we had from confidential witnesses, from the documentary evidence. It's very long, but we tried to meet what the Judge Jones said we needed to put in there, including with regard to the insider trading allegations, which in this case are hugely significant. Now, what happened was the case then got assigned to a newly seated district judge in San Diego. So, notwithstanding the fact that we had tried to follow Judge Jones' prescriptions, we were in front of a new judge with this complaint, extreme detail, I think, that pleads a claim for relief. And we ended up with the orders that are now on appeal. And we did decide not to further amend our complaint, because, frankly, we think this is enough under the law. Now, some of the things that we've alleged that are significant vis-a-vis the directors, primarily, we've got allegations against John Moores. He calls himself an outside director. That's a name that he gives himself conveniently, but that's not what's alleged here. And, frankly, I think any fair construction of this complaint would show that that's not the facts. This gentleman found it. Do you see all the directors to be painted with the same brush? Or there are a bunch of people we have to sort out here. We just can't, you know, say you're all this or you're all that. Do you see any particular differences between any of these outside directors that you seek to bring in a lawsuit? Yes, Your Honor, there are differences. And we tried carefully to suggest that and plead that in our complaint. There unquestionably are differences. Mr. Moores, for example, was a founder of the company. He arranged the IPO. He imposed on the company or picked all of the people who became the chief executive officer of the company, the chief technology officer of the company, Mr. Nelson, the general counsel of the company, who didn't tell you in his brief, by the way, that he had been indicted in this matter. And our civil claim for relief against Mr. Nelson, an indicted individual, has been dismissed with prejudice based on essentially the same facts that are in the indictment. There's something not right about that. Let me ask you some more particular questions. Yes, sir. I appreciate, you know, the education about the general principles of law. But can we start with the notion, and tell me if I'm right or wrong, that your claims against the outside directors all stem from the April 14, 1999 meeting where the board approved the use of selling accounting. Is that where we start? That's the starting point, but not by any means the totality. You talk about these false statements that were thereafter made. You talk about press releases, analyst reports, and SEC filings. And the complaint alleges that all these named defendants read and approved Peregrine's press releases. Is that the essence of your claims against them? No, Your Honor, that's not. That's a surface summary of what we've alleged. And in these 200 pages we have far greater detail, and I'd like to talk about that. Right now, for example, as to Mr. Morris. Yes, all these people, or almost all of them, and we've parsed this very carefully in our complaint, who was in attendance at particular board meetings and who wasn't, who was in attendance at particular audit committee meetings and who wasn't, and the nature of the information that they got. This is set forth in exacting detail. How did they know that selling accounting was per se unlawful? I guess it's not per se unlawful, is it? You're not claiming that, are you? Your Honor, we're not claiming it's per se unlawful, but it is highly, highly risky. And think about what happened here when it was imposed at that time. First of all, the CFO of the company refused to change the policy unless he got the entirety of the board to agree to it. That's highly irregular and unusual. The accounting firm, Arthur Anderson, told the board at that time that they were uncomfortable with this policy, especially if it reached a certain percentage. But there's a gap. I mean, selling accounting you now acknowledge is not per se unlawful. There may be times when it's unlawful and times when it's not unlawful. Can you give me the dividing line when it crosses the line and tell me whether these outside directors knew that? Your Honor, we don't say that they are outside directors. Mr. Moores was not, Your Honor. That's not how we have alleged it, at least. Your Honor, what I would say to that is if you apply sell-in and don't have a commitment from either the reseller or a third party to purchase, you cannot recognize that revenue. But did these folks know the specific nature of these, the absence of commitments and what exactly the deal was to these people, that these were bogus types of arrangements? That gets to the heart of it. Yes. What's alleged that shows that? First of all we can take a strong inference. Certainly. First of all, Mr. Gardner's review and outlook reports to the board flagged a huge problem with channel inventory. If they were being paid by the reseller for the channel inventory, there's no issue. The reason he raised it was because they weren't getting paid. This was blatantly obvious. That's why in these reports. So where does it show that in these reports? Give me an example. Well, I will, Your Honor. An example is the complaint, tab 2, paragraph 165, for example. One of the reports. Our channel business is cause for concern. We have been unable to sell through to remove the inventory from the channel. We've got a huge latency period of six to nine months. I mean, we have a lot of this in this complaint as to these reports that were delivered to and read by Mr. Moores and the other board members. Mr. Moores received an e-mail, was forwarded an e-mail from the CEO of this company, from the general counsel of this company, from a salesperson in their Asia division, which laid it out. Which report are you talking about? What month? Is that the July one? January 2000, paragraphs 154. And paragraph 154, Your Honor, is an example. But, Your Honor, there's many. In fact, we've got a chart in here that shows the level of channel inventory ballooning. But, you know, when I go through the reports and outlooks, January 2000, July 2000, October 2000, January 2001, there's no question that in July 2001 that it requires a lot of reading and reflection upon the judges. But it seems that you omitted a lot of the so-called bullet points which balance these reports out. No, Your Honor. We didn't eliminate any significant. I don't think we eliminated significant material. It wasn't our intention to do that. We're obviously highlighting what we think is important. I don't know. Let me give you an example. I mean, and I can't go through all of these. We'll be here all day. But you tell me if I'm wrong. In the January 2000 report, the complaint excerpts three bullet points from the section entitled, the four bullet points contained under the section entitled, why was it the best of the times? And the four bullet points under the section entitled, why was it a time of wisdom? Anyway, going on and on and on, it seems to me when we read these things collectively, there's good news, there's bad news. There seems to be, you know, some sort of a sense that this is just not one-sided or one-dimensional. I'd like your take on that. Well, Your Honor, my take on that is that's what we allege the district court erred in doing, in giving, in analyzing this and giving, and fly-stacking each word and each sense and saying, oh, the negative is out-balanced by the good. Your Honor, this was indisputably a massive fraud. Well, you know that. But, you know, what's our function? We have they-know-who-review responsibilities. Yes. Are we to look at all these reports now and make that judgment call as a matter of law under our they-know-who-review? Well, certainly they should be looked at because they're part of the complaint. I think you should look at the allegations of the complaint to see if taken as true they give rise to a strong inference of scienter, of reckless conduct. And I don't have a problem with these documents being reviewed in their totality. I have no problem with that at all. The identification, the complaint of the bloating channel inventory and the reports that are consistently being given to these board members are very damning. And I'm happy to have them analyzed, Your Honor. This whole idea of doing the sell-in, they had already finished the quarter. It was a manipulation right then and there. The quarter was over. And the CFO came in and said, you know what? We're not going to hit our numbers that we report to the street unless after the end of the quarter we change our accounting policy. I mean, that shows you the mentality of this company, Your Honor. They did it after the fact. And how did they change their disclosure to supposedly inform the market about this material item? They added one word to their description of their accounting policy. Whereas it used to say we sell through direct, it said direct and indirect. It gave no explanation of the impact of that, Your Honor, on their prior reported results, the comparisons they would have to make between different fiscal years. There was no information whatsoever. Your Honor, I would like to add that I'm happy to have those reports reviewed in detail because I think they support us. I think they make clear that this board was given negative information. They were trading on that negative information. Each quarterly announcement, when the Attorney General of the United States came out and announced the indictments in this case, he said, this is because this company wanted to hit those numbers quarter after quarter after quarter, no matter what, rules and regulations be damned, in effect. Now, the individuals ---- I'm afraid we're running out of time. Okay. Your Honor, I'll reserve some. I just want to point out that in addition, the e-mail that Mr. Moores received clearly showed it laid out a track record for him exactly how the fraud was being conducted. And in addition to that, Your Honor, I haven't had time to go into this. There's extraordinary insider selling in this case. The District Judge Jones told us what we needed to do to meet the test. We did it, Your Honor. There's $400 million worth of insider selling by Mr. Moores alone, perfectly timed after positive statements that were made to the market that were contradicted by the negative information that was in here. He profited while the investing public suffered huge, massive billion-dollar losses. We're just asking for a chance to do discovery in this case. That's what it's about. Thank you, Your Honor. All right. Good morning, Your Honor. May it please the Court. My name is John Quinn. I'm with Quinn Emanuel. I represent John Moores. We've divided up the time. My remarks are going to apply as well to the other outside directors. Counsel for Baring, I'm going to take 12 minutes if it's acceptable to the Court. Counsel for KPMG, Baring Point, is going to take six minutes. Counsel for Mr. Nelson will speak for two minutes. You can divide up the time. If you divide that time up as much as you want, you've got 20 minutes. I understand, Your Honor. Hopefully, those numbers I gave add up to 20 minutes. Go ahead, Mr. Quinn. Everybody knows there was fraud at Peregrine, and there's no secret about what the fraud was. Revenue was recognized on sales that were not sales. They were sales because there were secret side agreements which provided that the purchaser did not have to make payment if they couldn't find an end user. Do you think Moores knew about that? Mr. Moores did not know about it. How big was this company? I mean, it was a substantial software company. Are we talking like an IBM kind of company? Are we talking, you know, this was a high-tech developing unique software in its market where people sort of basically knew what was going on? Your Honor, I believe it's a company of a couple thousand employees with operations around the world. And where were their primary executives located? They were headquartered in San Diego. But there is not a fact alleged. There's no confidential witness. And, Your Honors, there is no document, I repeat, no document that has been cited to you that indicates that Mr. Moores or any of the outside directors were aware of these side agreements. Why do you call them outside directors, by the way? Outside director because he's not an employee. Is that a term of art or something? I believe it is. Why are you calling them outside directors? An outside director to me means somebody who has no connection with the company but basically is coming in independent and whatnot. It's alleged in the complaint that he was seen roaming the halls once a quarter. That's how often Mr. Moores was there. He was the founder of the company. He was not the founder, actually. He wasn't the founder? He was not the founder. What was his role? He came in very early on, provided some seed financing. He was a chairman for a while. He was a chairman at the time the company became public, at the time of its IPO. He was never an employee of the company. An inside director, and we've cited authority on this, it's generally used in the business and legal world to refer to people who aren't employed, like the CEO. The only difference is he wasn't employed. And he wasn't there involved in the company's operations day to day. And he wasn't. There are no facts alleged that he was. What they allege is that he was seen roaming the halls once a quarter. He had offices across the street. Look, he was a very significant, he was a major investor in this company. He sold a lot of stock. He made a lot of money. There's no question about that. You don't think he cared about how the company did? Of course he did. Absolutely he cared about that. And he had duties as a director. And there's still a Section 11 claim under the 33 Act pending against him down in San Diego. There are duties under Delaware and California Corporation Law that are asserted against him and the other directors. But the issue we have here is did he make knowingly false statements? Did he ever? And I submit there is no evidence. Issue was joined on this in the brief. Any evidence at all that Mr. Moores or any of the other outside directors knew about these side agreements? You know, this is, I hear my comments probably earlier today. You know, this is, we're at the pleading stage. Of course. This is a 12B6 case got kicked out on 12B6. No, but we have. And admittedly, they got a tough burden, and I understand that. But it's not an impossible burden. No, absolutely it's not. And they pled a case against the CEO, the CFO, the insiders. There's no question. The guilty pleas, Your Honors, are attached to the complaint. They say this was secret. We did it secret. That's what they, that's their account. For some reason, they attach that to the complaint. You can see those. Where are the facts? Where are the evidence? Look, this is very, plaintiff's case here is real simple. Mr. Moores made a lot of money. The public lost a lot of money. He was in very early on. He was involved in the IPO. At one time, he was the chairman. End of case. But that's not what we're here about. Did he make any statements or do any acts, if you want to go to Simpson, in furtherance of a fraud, consciously knowing of a fraud? And the standards are not recklessness. Under Silicon Graphics, it's deliberate or knowing recklessness. It's deliberate recklessness. And we challenged them in the brief. Give us any evidence that Mr. Moores knew this. Now, you don't now, you know, I think Intel Labs, as counsel said, I don't know if it was counsel or somebody else today, but you don't need a smoking gun. Of course not. You don't need a smoking gun. It's hard to prove fraud. I mean, you hard, you know, you don't prove, you generally have to prove fraud through circumstantial evidence. And we know that circumstantial evidence can be just as good as direct evidence. We use it all the time in criminal cases. Of course. And so what we have to do here is look at the complaint, and the Supreme Court tells us in Intel Labs, you look at the complaint. I use the term holistically. I think they said you look at the whole, you know, you look at the whole thing, and you don't go down charge by charge by charge and do divide and conquer. No, absolutely. And that's one thing about the district court's complaint here was it was long. I mean, the district court's order here was long, but my goodness, it was extremely detailed. It was, but I think looking at it, Judge Pius, looking at it as a whole isn't inconsistent with looking at the individual parts. In fact, I don't think you can look at it as a whole without looking at the individual parts. And Judge Bonita said at page 67 of his decision that his job was to find out, and I quote now, whether the total of the allegations arise to the level of scienter. And he did that. He looked at the total. He looked at everything. I submit that what you have here is the plaintiff wants to parse the evidence. The plaintiff is telling you, no, it's only look at the parts of these review and outlooks that we want to quote. They're the ones that don't want you to look at the totality of the evidence. If there was ever a securities case where the plaintiff had more evidence in pre-pleading discovery than this one, I don't know what it is. They had the internal investigation done by the firm of Leithman Watkins, 350 boxes of documents, the SEC files, everything out of the bankruptcy proceeding. This has been investigated to a fairly well. They had all that. That's why they took four months to amend their complaint. But we asked them, where is the evidence that the outside directors knew about this? And they responded, reply brief, pages 15 to 16. And I don't have a lot of time to go through this in any detail. They refer to an October 3, 2001 email, which they tell you was an email from an employee named Ron Hall in Australia that tells them about side agreements. One, it's an anonymous email. So when Mr. Moore's, it's a generic email address, Peregrine at Hotmail.com. He didn't know it was from an employee. He gets on his computer, anonymous email. Two, you can look at the document. They tell him that Mr. Gardner, the CEO, one of the guys who's been indicted, forwarded it to him. Look at the document. He got it. He forwarded it to Gardner the other way around and said, what's going on here? Gardner responded to him. You can see the response. It's before you. Gardner responded, facts are wrong. I will investigate. That's what the document says. And there's no facts pleaded that Moore's knew that Gardner was up to something wrong at that point. The next document they cite, the complaint, they refer paragraph 225 in our complaint. We referred to an Arthur Anderson memo that refers to, makes a specific reference to side letters, quote, unquote, specific reference to side letters. Look at the document. It's in the record. SER 246, 247. Supplemental exhibits to the record. It doesn't refer to side letters. The third thing, and this is my favorite, they refer to the fact that on April 29, 2002, KPMG advised the board that it had found some side letters and a restatement might be necessary. This is at the end. This is as a result of the investigation which the board of directors put in motion. It was discovered. KPMG came in and said we found some side letters. We don't know how far this goes. A restatement might be necessary. Press releases then go out April 30th, May 6th. Those are put in the complaint. You've got them before you, complaint, paragraph 642 and 643. Immediately after KPMG says this, they tell the world we can't do our financial statements. We may have to do a restatement. So there is simply no confidential witness. I'd love to talk about this inventory issue. If you read those documents, you see what's being said is that there's a buildup. Our resellers are not selling through. That raises an issue ultimately about collectability. We might have to revisit that. And in that same document, the CEO Gardner has a plan for dealing with it. He says we're going to stop recognizing 100% because of this buildup in the inventory. That has nothing to do with whether the resellers at the outset had made a commitment to buy, whether it was appropriate to recognize that revenue in the beginning under the applicable gap standard. The stock sales, Your Honor, look at Mr. Moore's sales before and after. This is not an instance where he hadn't sold for five years. Equal numbers, slower pace. Thank you very much. All right. Who's going next? Okay. Okay. May it please the Court, Your Honor, my name is Jim Lyons with the Skadden Arms Firm. I'd like to address my remarks today on behalf of my client, Bearing Point, and also to refer to KPMG. I understand the Court's further commentary about the Stone Ridge case, and what I propose to do is confine my remarks to two other reasons why we believe the Court should affirm Judge Benitez's order dismissing the claims against the KPMG defendants with prejudice, loss causation, statute of limitations. With respect to the background issue, Your Honor, we are third-party vendors. The KPMG defendants were third-party vendors. And, by the way, the consulting business that's involved here was transferred from KPMG, LLP, the accounting company, to Bearing Point, the consulting company, in January 2000, early on in the class period. There are ten software transactions allegedly entered into by the KPMG defendants with Peregrine on which Peregrine falsely reported revenue. The lead plaintiff alleges that Peregrine was a house of cards whose books were cooked by senior management and in which Arthur Anderson participated, Your Honors. And in that context, we don't believe that loss causation can be established under the Supreme Court's decision in Dura. Dura requires a causal connection between the material misrepresentation or other fraudulent conduct and the economic loss claimed by the plaintiff. And here, Your Honor, the only allegation of loss causation is found at paragraph 666 of the First Amendment complaint. And that's the claim that shares were bought at an inflated price and the plaintiffs were damaged thereby. Now, Your Honor, under Dura, that's an allegation that Dura makes clear is precisely what's not sufficient to establish loss causation. An inflated purchase price will not itself constitute or approximately cause the relevant economic loss. That's Dura at page 342. And indeed, Your Honor, in order to establish this causal connection, proximate causal connection between the conduct alleged by the KPMG defendants and the economic loss of the plaintiffs to climate stock value, I think a fair reading of the First Amendment complaint is that there are many allegations that negate the existence of that causal connection. What significance, if any, should be placed upon Rada's plea agreement in respect to the issue of loss causation? Does that have any significance at all? No significance at all in the context of loss causation. Rada's plea agreement was never disclosed to the public. The existence, Your Honor, the participation of the KPMG defendants in the false reporting of revenues by Paragon was never disclosed to the public during the class period. And indeed, Your Honor, Rada's plea agreement was a plea to a conspiracy allegation of conspiracy to commit securities fraud, which I believe this court in Glenfed, which I think Judge Farris sat on that panel, determined was a claim of secondary liability. It's not primary liability under central bank. Your Honor, with respect to those points, there are 10 transactions alleged in which the KPMG defendants allegedly participated. But in every respect, the decision to decide how to account for those transactions was done completely by Paragon and Paragon's management. There's no allegation, none, that the KPMG defendants had any role in that whatsoever. And indeed, if you take the totality of those transactions, the amount to only about 2% of the total amount of revenue that Paragon recognized during the restatement period. If you just focus on the KPMG LLP part, the first two transactions, it's less than 1%, much less than 1%. So we're talking about a situation where plaintiff needs to show, under those facts, how the role of the KPMG defendants causally resulted in a loss to the plaintiff's class, which we submit cannot be established here. Now, Your Honors, I just have a few more minutes, but I wanted to focus on one other aspect of the reporting issue to deal with this issue of loss causation. And I'd like to focus my comments on this panel's decision in Dow Systems. In Dow Systems, this court addressed the issue of loss causation and talked about how the plaintiff is required to show that defendants' conduct was a substantial cause of the investment's decline in value. And again, Your Honor, based on the allegations of complaint, the insignificant minor role that the KPMG defendants played in this broad scheme, I submit plaintiffs are not able to establish that connection. Indeed, there's no decline in the price of the stock of Peregrine that's alleged by plaintiff as a result of any participation by the KPMG defendants in these transactions. It is correct that there was a press release issued on May 6, 2002, which revealed the existence of accounting irregularities. There is no mention, and as a result of that, the price declined, I think plaintiffs allege, by 67%. But there's no allegation in there at all that there was any role played in that in connection with the KPMG defendants' transactions with Peregrine. Later, plaintiff alleges, on May 28, 2002, there was a disclosure of KPMG's role in the transactions with Peregrine, in which Peregrine alleges calls them questionable transactions. That's at paragraph 645. That disclosure, however, was after the end of the class period, which ended on May 2, and there's no allegation that the market reacted in any way to that disclosure, that disclosure of the role by the KPMG defendants. So based upon that, we don't believe there's any basis upon which plaintiff can plead the required proximate causal connection between the conduct of the KPMG defendants and the resulting economic loss. The economic loss here, Your Honors, resulted from a fraudulent scheme that would have happened and went forward without any role by the KPMG defendants. Are you conceding that the complaint alleges primary violations of 10b by your clients? Not at all, Your Honor. You don't address that. You just go right to the alternative. Well, Your Honor, the issue about the primary violation, I think, is the question that's before the Supreme Court in Stonebridge. And our position in that respect is that there is no basis for primary violation here, because all that's alleged is what amounts to an eight-and-fifteen claim. If that comes out of the Supreme Court. Right now, there's been a determination by the lower court that there is no primary violation. Correct. But we still, I guess, as a matter of providence, should wait for the Supreme Court. But we never have to reach the issue of loss causation or statute of limitations if, as a result of Stonebridge, there's no primary violation here, correct? Yes, and I think, Your Honor, to very quickly call on that to deal with that issue, I think the answer is found in this court's decision in Simpson at page 1050 of that decision, in which the court ruled that participation in a legitimate transaction, which does not have a deceptive purpose or effect, would not allow for a primary violation even if the defendant knew or intended the other party would manipulate the transaction to effectuate a fraud. That's the allegations against us. We engage in ten transactions in which we received a benefit, namely hundreds of thousands of dollars in service contracts. Those are not illegitimate transactions. And even though an allegation is made through the plea agreement, for example, Mr. Rada, that Mr. Rada knew about the false accounting, that falls right within this language under Simpson. I would submit that does not establish primary violation. And after all, the conspiracy claim is secondary liability. That's all that Mr. Rada admitted to in his plea agreement. Thank you. May it please the Court. Christian Humphreys, McKenna, Long, and Aldridge on behalf of Defendant Richard Nelson. I want to address two points. First, the indictment, and then second, that Mr. Nelson is in a little different situation. He's not alleged to have made statements. He's alleged to be a participant in the scheme. With respect to the indictment and the alleged failure to disclose that to the Court, I'd like to deal with that because, like Judge Bach, I don't want to be a defendant in a securities lawsuit either. It's true. Mr. Nelson has been indicted, but that's all. It's just an indictment. The model jury instructions in the Ninth Circuit say that the instruction to the jury in that case, after just having read the indictment, would be that it's not evidence of anything. And so I don't know what saying that someone has been indicted does for anybody, except tell you that the government thought that it could make a case. That's it. On the second issue, on scheme liability, we know that Mr. Nelson was not alleged to have made a statement because the plaintiff's counsel themselves told us that below in a concession they made to the trial court. It's in Nelson's excerpts of record at 50 where they say, The lead plaintiff does not allege Nelson violated federal securities laws because of any statements he made. Rather, the claims against Nelson are based on his employing devices, schemes, and artifice. Basically, Nelson's culpability or liability would depend upon whether the Supreme Court broadens the reach of scheme liability and so on. I agree with that, but I also think there's a shorter road for the Court to get there, and that is to look at the allegations that are made as to his supposed participation because they are very, very superfluous. They're not sourced. They don't provide the information, the belief information, that the Court needs. And you'll find them at 52 to 56 of the reply brief. And when you go back and you look at those and you reread paragraphs 300 to 315 in the complaint where the Nelson allegations are, what you'll be struck by is the vast majority say Nelson learned information and he didn't do anything. He didn't go out and disclose anything. But there's no obligation for him to do that, and we know that from Central Bank. There are a few other allegations where Mr. Nelson is alleged to have made his own conduct engaged in something that they claim constitutes a fraud. But I would submit to you that those allegations are not well pleaded. They're an attempt to plead fraud by hindsight because they say things like, which resellers, which transactions, how much revenue, where did they get this information? None of that is there, and I think the complaint was properly dismissed and the judgment should be affirmed. Thank you very much. Thank you, counsel. We have a few minutes for rebuttal. Just on the last point, Your Honors, I don't know what counsel is talking about, but in our complaint with respect to Mr. Nelson, we have detailed multiple instances in the complaint where he was presented with information respecting known false transactions, the memo from Boonin, the four-page memo from Benjamin. It is all there in detail. They keep talking about our reply brief. How about our complaint? The allegations are in our complaint. They're glossing them over, and I respectfully submit that if they're examined in their totality, everything is there that is needed to plead this claim against Mr. Nelson and Mr. Moores, Your Honor. And we have spent quite a lot of space in the complaint identifying the nature of Mr. Moores' involvement. I'd like to talk about briefly the control person claim. It hasn't been mentioned here, but we've got a control person claim. It's not governed by the PSLRA. There's no heightened pleading requirement for that claim. It was dismissed by the district court, but it should not have been because we have alleged in great detail all the elements of the control claim. From the fact of Mr. Moores' ties to this company, and I don't have time to get into them in great detail, but they are there. And we have cited them in the complaint, in the briefs. They weren't involved in the day-to-day operations of the business at all, were they? That is absolutely not what's alleged, Your Honor. That's their conclusion. That's what they say there's no evidence of. We don't have to present evidence. We're on a pleading motion. We did plead, Your Honor, detailed involvement. We need to do something more than conclusory statements that they're involved in the operation of the business. Your Honor, it's in paragraphs 375 and 385 of the complaint. It's in an entire section called John Moores' control from February 2002 forward, Your Honor, when he was supposedly an outside director, not on the audit committee, but convened as chairman, all of a sudden, an audit committee meeting, and took over this company from there forward to the end of the class period. Your Honor, it's the complaint's allegations that must determine this. These are not conclusory allegations. They're detailed. They're excruciatingly detailed with regard to Mr. Moores. And he has misstated the insider selling that he engaged in, Mr. Moores. This theory of PACE theory, there's no law supporting that. The fact of the matter is he sold during prior to the class period approximately 40 percent of his holdings. During the class period, over 90 percent for $400 million, perfectly timed after Rosie announcements came out and in connection with a merger agreement that was undisclosed to the public on Harbinger. We've alleged the trading that occurred in February 2000. It's an egregious, blatant violation. Ronconi says, Your Honor, an insider cannot trade with regard to a known undisclosed merger plan except in violation of the law. That's what this complaint alleges. And we've got all the – you either have to abstain or disclose. And we have alleged the details of these plans for this merger with emails, phone calls, meetings, none of which was known to the public. This is just in further support, Your Honor, of the allegations of Sienta. And I would submit to the court that this idea that there's no evidence that they didn't know Selin was being improperly applied is just contrary to what we've alleged. It is completely contrary to what we alleged in the July – January 2001 reports, the July, October, December. All of these reports refer to problems with the channel bloat. They hadn't been paid, Your Honor. And that's the bottom line. Now your time is beginning to run. Your Honor, I have to close. KPMG, Your Honor, clearly – One minute. That's it. Your Honor, on KPMG, the loss causation allegations are there. Brutto didn't exist at the time we pled this complaint. But nonetheless, we've alleged it sufficiently. Again, it's not governed by 9B. It's not governed by a heightened pleading standard. We've simply alleged that there was a disclosure of accounting irregularities, which KPMG was part of. Ironically, they were disclosing it. But there was another part of this company. They were part of the fraud. And the stock price plummeted. That's all you need for a loss causation analysis. And under Simpson v. AOL, whatever happens, we don't know what's going to happen with the Supreme Court. But under existing law, under existing law, we have pled a primary violation against KPMG under that test that's laid out in that case. They contributed to a transaction or scheme that had a deceptive purpose and effect. They knew it. The guilty plea proves it. Thank you, Your Honor. Thank you so much. We appreciate all the arguments by counsel today. It's a complicated case. In the event we decide to defer submission, we will issue an appropriate order. All rise. This court shall stand in recess until confirmed witness. This court shall stand in recess until confirmed witness.
judges: Farris, Paez, Block